## ANDREWS *v.* ANDREWS.

ERROR TO THE SUPREME JUDICIAL COURT OF THE STATE OF MASSA-
CHUSETTS.

No. 23. Argued February 28, 1902.—Decided January 19, 1903.

When rights, based on a judgment obtained in one State, are asserted in the courts of another State under the due faith and credit clause of the Federal Constitution, the power exists in the state court in which they are asserted to look back of the judgment and ascertain whether the claim which had entered into it was one susceptible of being enforced in another State (*Wisconsin* v. *Pelican Insurance Company*, 127 U. S. 215; *Thompson* v. *Whitman*, 18 Wall. 457). And where such rights are in due time asserted, the power to decide whether the Federal question so raised was rightly disposed of in the court below exists in, and involves the exercise of jurisdiction by, this court.

Statement of the Case.

1. Although marriage, viewed solely as a civil relation, possesses elements of contract, it is so interwoven with the very fabric of society that it cannot be entered into except as authorized by law, and it may not, when once entered into, be dissolved by the mere consent of the parties.

The Constitution of the United States confers no power whatever upon the government of the United States to regulate marriage or its dissolution in the States.

A State may forbid the enforcement within its borders of a decree of divorce procured by its own citizens who, whilst retaining their domicil in the prohibiting State, have gone into another State to procure a divorce in fraud of the law of the domicil.

The statute of Massachusetts which provides that a divorce decreed in another State or country by a court having jurisdiction of the cause and both the parties shall be valid and effectual in the Commonwealth; but if an inhabitant of Massachusetts goes into another State or country to obtain a divorce for a cause which occurred in Massachusetts, while the parties resided there, or for a cause which would not authorize a divorce by the laws of Massachusetts, a divorce so obtained shall have no force or effect in that Commonwealth, is an expression of the public policy of that State in regard to a matter wholly under its control and does not conflict with the Constitution of the United States or violate the full faith and credit clause thereof. And the courts of Massachusetts are not obliged to enforce a decree of divorce obtained in another State as to persons domiciled in Massachusetts and who go into such other State with the purpose of practicing a fraud upon the laws of the State of their domicil; that is, to procure a divorce without obtaining a *bona fide* domicil in such other State.

2. Although a particular provision of the Constitution may seemingly be applicable, its controlling effect is limited by the essential nature of the powers of government reserved to the States when the Constitution was adopted.

As the State of Massachusetts has exclusive jurisdiction over its citizens concerning the marriage tie and its dissolution, and consequently the authority to prohibit them from perpetrating a fraud upon the law of their domicil by temporarily sojourning in another State and there procuring a decree of divorce without acquiring a *bona fide* domicil, a decree of divorce obtained in South Dakota upon grounds which do not permit a divorce in Massachusetts under the conditions stated in the opinion is not rendered by a court of competent jurisdiction and hence the due faith and credit clause of the Constitution does not require the enforcement of such decree in the State of Massachusetts against the public policy of that State as expressed in its statutes.

THE plaintiff and the defendant in error, each claiming to be the lawful widow of Charles S. Andrews, petitioned to be appointed administratrix of his estate. The facts were found as follows:

Charles S. and Kate H. Andrews married in Boston in April, 1887, and they lived together at their matrimonial domicil in the State of Massachusetts. In April, 1890, the wife began a suit for separate maintenance, which was dismissed in December, 1890, because of a settlement between the parties, adjusting their property relations.

In the summer of 1891, Charles S. Andrews, to quote from the findings, " being then a citizen of Massachusetts and domiciled in Boston, went to South Dakota to obtain a divorce for a cause which occurred here while the parties resided here, and which would not authorize a divorce by the laws of this Commonwealth; he remained personally in that State a period of time longer than is necessary by the laws of said State to gain a domicil there, and on November 19, 1891, filed a petition for divorce in the proper court of that State."

Concerning the conduct of Charles S. Andrews and his purpose to obtain a divorce in South Dakota, whilst retaining his domicil in Massachusetts, the facts were found as follows:

" The husband went to South Dakota and took up his residence there to get this divorce, and that he intended to return to this State when the business was finished. He boarded at a hotel in Sioux Falls all the time, and had no other business there than the prosecution of this divorce suit. I find, however, that he voted there at a state election in the fall of 1891, claiming the right to do so as a *bona fide* resident under the laws of that State. His intention was to become a resident of that State for the purpose of getting his divorce, and to that end to do all that was needful to make him such a resident, and I find he became a resident if, as a matter of law, such finding is warranted in the facts above stated."

And further, that—

" The parties had never lived together as husband and wife in South Dakota, nor was it claimed that either one of them was ever in that State except as above stated."

With reference to the divorce proceedings in South Dakota it was found as follows:

" The wife received notice, and appeared by counsel and filed an answer, denying that the libellant was then or ever had been

a *bona fide* resident of South Dakota, or that she had deserted him, and setting up cruelty on his part toward her. This case was settled, so far as the parties were concerned, in accordance with the terms of the agreement of April 22, 1892, signed by the wife and consented to by the husband, and, for the purpose of carrying out her agreement 'to consent to the granting of divorce for desertion in South Dakota,' she requested her counsel there to withdraw her appearance in that suit, which they did, and thereafterwards, namely, on May 6, 1892, a decree granting the divorce was passed, and within a day or two afterwards the said Charles, having attained the object of his sojourn in that State, returned to this Commonwealth, where he resided and was domiciled until his death, which occurred in October, 1897."

By the agreement of April 22, 1892, to which reference is made in the finding just quoted, it was stipulated that a payment of a sum of money should be made by Charles S. Andrews to his wife, and she authorized her attorney on the receipt of the money to execute certain papers, and it was then provided as follows :

" Fourth. Upon the execution of such papers M. F. Dickinson, Jr., is authorized in my name to consent to the granting of divorce for desertion in the South Dakota court."

Respecting the claim of Annie Andrews to be the wife of Charles S. Andrews, it was found as follows :

" Upon his return to this State he soon met the petitioner, and on January 11, 1893, they were married in Boston, and ever after that lived as husband and wife in Boston, and were recognized as such by all until his death. The issue of this marriage are two children, still living."

It was additionally found that Annie Andrews married Charles S. Andrews in good faith and in ignorance of any illegality in the South Dakota divorce, and that Kate H. Andrews, as far as she had the power to do so had connived at and acquiesced in the South Dakota divorce, had preferred no claim thereafter to be the wife of Charles S. Andrews until his death when in this case she asserted her right to administer his estate as his lawful widow.

From the evidence above stated the ultimate facts were found to be that Andrews had always retained his domicil in Massachusetts, had gone to Dakota for the purpose of obtaining a divorce, in fraud of the laws of Massachusetts, and with the intention of returning to that State when the divorce was procured, and hence that he had never acquired a *bona fide* domicil in South Dakota. Applying a statute of the State of Massachusetts forbidding the enforcement in that State of a divorce obtained under the circumstances stated, it was decided that the decree rendered in South Dakota was void in the State of Massachusetts, and hence that Kate H. Andrews was the widow of Charles S. Andrews and entitled to administer his estate. 176 Massachusetts, 92.

*Mr. Elbridge R. Anderson* for plaintiff in error.

I. In support of the jurisdictional question cited *Home Insurance Co.* v. *City Council of Augusta*, 93 U. S. 116; *Powell* v. *New Brunswick County*, 150 U. S. 433.

It is not necessary that the Federal question appear affirmatively upon the record or in the opinion if the adjudication of such a question is involved in the disposition of the case by the state court. *Kaukauna County* v. *Green Bay &c.*, 142 U. S. 254; *Willson* v. *Blackbird Creek Marsh Co.*, 2 Peters, 245; *Armstrong* v. *Athens Co.*, 16 Peters, 281; *Chicago Life Ins. Co.* v. *Needles*, 113 U. S. 574; *Eureka Lock Co.* v. *Yuba Co.*, 116 U. S. 410; *Chapman* v. *Goodnow's Adm.*, 123 U. S. 540.

II. Both parties submitted to the jurisdiction of the South Dakota court. No fraud was practised upon the court. Under the Constitution of the United States the judgment of divorce is conclusive. It appears that the state court felt constrained to sustain the appeal because of Pub. Stats. of Massachusetts, chap. 146, sec. 41, which provides that "when an inhabitant of this Commonwealth goes into another State or country to obtain a divorce for a cause which occurred here while the parties resided here, . . . . a divorce so obtained shall be of no force or effect in this Commonwealth.' It is

important, therefore, to consider the validity and scope of this statute. Const. art. 4, sec. 1; Rev. Stat. sec. 905.

Such judgments as are protected by this constitutional provision cannot be nullified by any state law, and on the question what judgments are so protected, the decisions of this court are controlling. *Christmas* v. *Russell*, 5 Wall. 290; *Laing* v. *Rigney*, 160 U. S. 531.

On the one hand there is a plain intimation that an *ex parte* judgment of divorce is not conclusive beyond the State in which it is rendered, and that every other State is at liberty to give it such effect as may seem proper as a matter of comity or public policy. *Pennoyer* v. *Neff*, 95 U. S. 714, 731, 734. " On the other hand it is settled that where the appellant has resided in the State for the period required by the local laws and the defendant is before the court, a judgment of divorce is conclusive everywhere." *Cheever* v. *Wilson*, 9 Wall. 108.

Under this decision, if Andrews was in fact a resident of South Dakota when he applied for his divorce, then the judgment is conclusive. If he was not a resident, then the question as to whether the judgment is open to attack upon that ground is left undecided.

Andrews was a resident of South Dakota at the time he applied for his divorce, *Thayer* v. *Boston*, 124 Massachusetts, 132, 148, notwithstanding that he intended to return to this State when the business was finished. Methodist clergymen are required by the rules of their denomination to change from place to place every two or three years, but these rules do not prevent the clergyman from obtaining a residence and a right to vote in every place in which he resides. *Holmes* v. *Green*, 7 Gray, 299; *Carnoe* v. *Inhabitants of Freetown*, 9 Gray, 357; *Sleeper* v. *Page*, 15 Gray, 349, 350.

The finding of the South Dakota court that Andrews was a resident of that State is conclusive in the absence of fraud. The defendant was before the court; it was open to her to try that question there; she cannot try it in Massachusetts or here. *Noble* v. *Union River Logging Railroad*, 147 U. S. 165.

Within the distinction here indicated the fact of the residence

of the libellant in a divorce suit in which a defendant appears is *quasi* jurisdictional. By the great preponderance of authority, the findings of the court upon this question are held to conclude the parties to the proceeding in the absence of fraud. *Ellis's Estate*, 55 Minnesota, 401; *Kinnier* v. *Kinnier*, 45 N. Y. 535; *Jones* v. *Jones*, 108 N. Y. 415; *Kirrigan* v. *Kirrigan*, 15 N. J. Eq. 147; *Fairchild* v. *Fairchild*, 53 N. J. Eq. 678 (1895); *Waldo* v. *Waldo*, 52 Michigan, 94 (1883); Van Fleet Collateral Attack, sec. 648 (1892).

The conclusive effect given by the New York courts to judgments of divorce rendered in the presence of both parties is the more noteworthy from the fact that it is still held in New York that *ex parte* judgments of divorce obtained in other States are of no validity in New York whether the libellant was or was not a resident of the State where the divorce was obtained. *People* v. *Baker*, 76 N Y. 78; *O'Dea* v. *O'Dea*, 101 N. Y. 23.

*Waldo* v. *Waldo*, 52 Michigan, 94, sustains contention of plaintiff in error fully and controls everything to the contrary in *People* v. *Dawell*, 25 Michigan, 247.

There are only two cases in which a judgment of divorce obtained in another State, the defendant appearing, has been held void in Massachusetts. *Chase* v. *Chase*, 6 Gray, 157; *Hardy* v. *Smith*, 136 Massachusetts, 328, in which the wife obtained a decree of divorce from a Utah court pursuant to an agreement with her husband under which he fabricated the evidence by which she sustained her libel. After her death he was permitted to maintain his right as husband in her property notwithstanding the divorce.

This decision is not inconsistent with any position we have taken or need to take in the present case, since it cannot be contended, in the face of Mr. Justice Hammond's findings, that Andrews perpetrated any fraud upon the South Dakota court. "His intention was to become a resident of that State for the purpose of getting his divorce, and to that end to do all that was needful to make him such a resident, and I find he became a resident if, as a matter of law, such finding is warranted on the facts above stated"   Page 32, Record.

It is to be noticed that while fraud is suggested in the New Jersey cases as a ground for collateral attack, the fraud referred to means fraud upon one of the parties to the suit. Collusion, unless it involves an agreement to commit perjury or some other illegal act, is not treated either there or in any other jurisdiction as a ground for attack, but rather a ground for estoppel.

III. It is a universal proposition that the judgment of a court which has the power to enter judgment upon the facts alleged is binding upon the parties before it, and that this proposition is true of divorce judgments as of other judgments. "If both parties colluded in a cheat upon the court it was never known that either of them could vacate the judgment." *Prudam* v. *Phillips*, Hargraves' Law Tracts, 456 ; *Adams* v. *Adams*, 154 Massachusetts, 290, 297 ; *Edson* v. *Edson*, 108 Massachusetts, 590, 598. In some States it was held on an indictment for adultery that a divorce obtained in the State in which neither party resided, although the parties had submitted to the jurisdiction, was no defence. *People* v. *Dawell*, 25 Michigan, 247 ; *State* v. *Armington*, 25 Minnesota, 29. But in later cases these courts have held that a divorce obtained under the same circumstances was not open to attack by either party. *Waldo* v. *Waldo*, 52 Michigan, 94 ; *Ellis's Estate*, 55 Minnesota, 401.

A party who assents to a divorce judgment is bound by it. In some cases the judgment has been attacked on want of jurisdiction, collusion and fraud upon the court. In some cases the party making the attack was the original libellant, and in others the libellee, who either agreed to the divorce judgment at the time, or subsequently acquiesced in it by marrying or by permitting the libellant to marry without objection.

Cases in which a woman has renounced her status as wife, and has later tried to assert her status as widow, are not infrequent, but the unanimity with which the court has discouraged this form of enterprise is impressive. *Nichols* v. *Nichols*, 25 N. J. Eq. 60 ; *Zoellner* v. *Zoellner*, 46 Michigan, 511 ; *Richardson's Estate*, 132 Pa. St. 292 ; *Arthur* v. *Israel*, 15 Colorado, 147 ; *Mohler* v. *Shank*, 93 Iowa, 273 ; *Marvin* v. *Foster*, 61 Minnesota, 154 ; *Stephens* v. *Stephens*, 51 Indiana, 542 ; *Nichol-*

*son* v. *Nicholson*, 113 Indiana, 131; *Davis* v. *Davis*, 61 Maine, 395; *Miltimore* v. *Miltimore*, 40 Pa. St. 151; *In the Matter of Morrison*, 52 Hun, 102; affirmed 117 N. Y. 638; *Ellis* v. *White*, 61 Iowa, 644; *Elliott* v. *Wohlfrom*, 55 California, 384. In the foregoing cases the original divorce judgment was attacked in some instances on jurisdictional grounds and in others on non-jurisdictional grounds of fraud and collusion, and where the parties have submitted to the jurisdiction of the court there is no valid ground of distinction between the two cases.

If there is any ground for holding that the parties to a divorce judgment are not bound by it, that must be because the State is interested to uphold the marriage relation even against the will of both parties. But if that is the true ground, then it is clear that it can make no difference whether the fraud practised upon the court is a jurisdictional fraud or some other kind of fraud.

No state court would allow a divorce decree of its own tribunals, rendered in the presence of both parties, to be attacked upon the jurisdictional question or upon any other. If this be true we submit that the Constitution of the United States protects under the same circumstances the decrees of other States.

IV. The recent cases decided by this court in no way change the law as it heretofore existed, but are declaratory of the principles contended for in this brief. *Bell* v. *Bell*, 181 U. S. 175; *Streitwolf* v. *Streitwolf*, 181 U. S. 179.

In both these cases the decree of divorce sought to be set up was obtained in cases where there was no appearance by the respondent, and the proceedings were *ex parte.*

The case of *Atherton* v. *Atherton*, 181 U. S. 155, in no way applies to a case like the case at bar and in no way affects the principles contended for in this brief.

*Mr. Wayne Mac Veagh* and *Mr. Frank Dewey Allen* for defendant in error. *Mr. Frederic D. McKenney* was with them on the brief.

I. No Federal question is presented by this record for the consideration of the court. Possibly a Federal question might

have been raised in the courts of Massachusetts which would have supported the writ of error from this court, but it does not appear that the courts of that Commonwealth were called upon to consider any Federal question, nor do they appear to have disposed of one. Under such circumstances, the writ of error should be dismissed. *Loeber* v. *Schroeder*, 149 U. S. 580; *Sayward* v. *Denny*, 158 U. S. 180; *Pim* v. *St. Louis*, 165 U. S. 273; *Oxley Stave Co.* v. *Butler' Co.*, 166 U. S. 695; *Chapin* v. *Fye*, 179 U. S. 129.

The mere fact that the state courts " decreed that the divorce obtained by Charles S. Andrews in South Dakota is of no force and effect in this Commonwealth " does not of itself raise a Federal question necessitating the exercise of appellate powers by this court, for if it appears upon the face of the foreign decree or otherwise that the court of its origin was without jurisdiction to pronounce it, the so-called decree is in fact no decree, and consequently no constitutional question can arise thereabout. *Bell* v. *Bell*, 181 U. S. 175, and cases cited; *Streitwolf* v. *Streitwolf*, 181 U. S. 179; Schouler on Husband and Wife, sec. 574; *Sewall* v. *Sewall*, 122 Massachusetts, 156; *People* v. *Dawell*, 25 Michigan, 247.

It does not follow, because a court has the statutory power to grant divorces, that faith and credit must necessarily be accorded to its decrees, for to enable such court to render a valid decree of divorce it must also happen that at least one of the parties to the proceedings was a domiciled citizen of the State from which the court derives its powers. *Hood* v. *State*, 56 Indiana, 263; 26 Am. Rep. 21. The Massachusetts courts have uniformly refused to recognize the validity of divorces granted by other States where a party has gone into another State without acquiring a domicil there for the purpose of obtaining, and does obtain, a divorce for a cause which occurred in but which was not a cause of divorce by the law of Massachusetts, on the ground that the court of that State had no jurisdiction, and its decree granting the divorce is entitled to no faith and credit in Massachusetts as a judicial proceeding, even if the decree recites facts sufficient to give it jurisdiction. *Sewall* v. *Sewall*, 122 Massachusetts, 156; *Hanore* v. *Turner*, 14 Mass-

achusetts, 227; *Chase* v. *Chase,* 6 Gray, 157; *Lyon* v. *Lyon,* 2 Gray, 368.

It is now well settled that each State has the right to regulate the status of its own citizens, but it has no jurisdiction to change or determine the status of citizens of a foreign State. *Ditson* v. *Ditson,* 4 R. I. 87; *Atherton* v. *Atherton,* 181 U. S. 155. Each State is the sole judge of the marital status of its citizens, and it alone has exclusive right to say upon what grounds or for what causes such status may be dissolved or modified. *Cook* v. *Cook,* 56 Wisconsin, 195; *Hunt* v. *Hunt,* 72 N. Y. 217.

The State of Massachusetts contravened no Federal right in enacting section 41 of chapter 146 of its Public Statutes.

II. On the merits and upon the facts as disclosed by the record that judgment must be affirmed.

By section 2558 of the Compiled Laws of South Dakota, Civil Code, it is provided that marriage may be dissolved only—

"1. By the death of one of the parties.

"2. By the judgment of a court of competent jurisdiction decreeing a divorce of the parties."

"SECTION 2578. A divorce must not be granted unless the plaintiff has, in good faith, been a resident of the Territory (State) ninety days next preceding the commencement of the action."

It is plain that a court may have jurisdiction to try a divorce case without having power to grant a valid decree of divorce to the applicant, even though he may allege and prove a cause for divorce under the laws of the State where relief is sought; for example, if the applicant be not in fact domiciled within the territorial jurisdiction of the court. Bishop, Marriage, Divorce and Separation, sec. 51.

The tribunals of a country have no jurisdiction over any cause of divorce, wherever or whenever it arose, if neither of the parties has within its territory an actual *bona fide* domicil. Nor does it make any difference that both parties are temporarily there, submitting to the jurisdiction. Bishop, Marriage and Divorce, 6th ed. sec. 144.

Though the words "domicil" and "residence" are not synonymous, a statute requiring a specified number of years' residence in a State to give the courts jurisdiction of an application for divorce is to be interpreted as requiring domicil. Bishop, Marriage and Divorce, 6th ed. sec. 124.

The principles of international law and the general principles of our own requiring the residence for divorce to be *unimo menendi*, such residence must at least partake of the character of permanency. *Whitcomb* v. *Whitcomb*, 46 Iowa, 437 ; *Hanson* v. *Hanson*, 111 Massachusetts, 158.

"If a party goes to a jurisdiction other than that of his domicil for the purpose of procuring a divorce, and has residence there for that purpose only, such residence is not *bona fide*, and does not confer upon the courts of that State or country jurisdiction over the marriage relations, and any decree they may assume to make would be void as to the other party." Cooley, Constitutional Limitations, p. 401. Citing: *Hanover* v. *Turner*, 14 Massachusetts, 227 ; *Greenlaw* v. *Greenlaw*, 12 N. H. 200 ; *Kimball* v. *Kimball*, 13 N. H. 225 ; *Bachelder* v. *Bachelder*, 14 N. H. 380 ; *Payson* v. *Payson*, 34 N. H. 518 ; *Hopkins* v. *Hopkins*, 35 N. H. 474.

In an action by the husband for his interest in the deceased wife's lands it appeared that the wife had gone to Nebraska temporarily to obtain a divorce. The law of Nebraska required as a condition precedent six months' residence. The wife remained within the State the requisite length of time. *Held*, that the Nebraska court had not acquired jurisdiction, and its decree of divorce in the case might be collaterally assailed. *Neff* v. *Beauchamp*, 74 Iowa, 95.

Residence in good faith includes the attributes of domicil. *Carpenter* v. *Carpenter*, 30 Kansas, 712.

It presupposes the intention of remaining in the place permanently. *Smith* v. *Smith*, 7 North Dakota, 412.

This view was applied to the case at bar as follows :

"Charles S. Andrews went to South Dakota for the purpose of getting the divorce, and intended to return to Massachusetts as soon as he had done so. Subject to this intention, it is found that he intended to become a resident of South Dakota for the

purpose of getting a divorce, and to do all that was needful to make him such a resident.

"The statute of South Dakota forbids a divorce, 'unless the plaintiff has, in good faith, been a resident of the Territory ninety days next preceding the commencement of the action.' . . . The language of the South Dakota statute must be taken to require not merely bodily presence, but domicil. In the light of the decisions upon similar acts, and the generally accepted rule making domicil the foundation, the words 'resident of the Territory' mean domiciled in the Territory, whether they also mean personally present or not," citing *Graham* v. *Graham*, 81 N. W. Rep. 44; *Dickinson* v. *Dickinson*, 167 Mass. 474, 475; *Reed* v. *Reed*, 52 Michigan, 117, 122; *Leith* v. *Leith*, 39 New Hampshire, 20, 41; *Van Fossen* v. *State*, 37 Ohio St. 317, 319.

"The finding of the single justice clearly means that the deceased did not get a domicil in South Dakota. He meant to stay there ninety days, and such further time, perhaps, as was necessary to get his divorce, and then he meant to come back to Massachusetts."

The facts in evidence warranted, and indeed required, the finding that Charles S. Andrews did not have a *bona fide* residence or domicil in the State of South Dakota when he obtained the decree of divorce there, and also the further finding that his wife, Kate H., had never been in that State.

Upon the authority of *Bell* v. *Bell* and *Streitwolf* v. *Streitwolf*, *ubi supra*, it is plain that the decree of the supreme judicial court must be affirmed unless the further facts found by that court, viz., that said Kate H., having notice of the pendency of the proceedings in the South Dakota court, appeared therein by counsel, filed an answer denying that the libellant was then or ever had been a *bona fide* resident of South Dakota, and subsequently "for the purpose of carrying out her agreement, 'to consent to the granting of a divorce for desertion in South Dakota,' requested her counsel there to withdraw her appearance in that suit, which they did," and afterwards, without further objection on her part, the decree now attacked was passed, are material and necessitate a different result.

These additional facts cannot affect the result unless connivance or consent can serve to render a decree otherwise void for want of jurisdiction in the tribunal pronouncing it valid.

However this might be in ordinary suits *in personam*, in divorce proceedings consent cannot vitalize an otherwise void decree, for the courts of a State where neither party is domiciled are without jurisdiction in law to render a valid decree of divorce, and as such suits are not merely suits between the husband and wife, but affect a public institution, their consent cannot confer jurisdiction, so that where a divorce is granted in a State where neither party is domiciled, but in a proceeding in which both have appeared, their married status is not affected. *Harrison* v. *Harrison*, 20 Alabama, 629; *McGuire* v. *McGuire*, 7 Dana (Ky.), 181; *People* v. *Dawell*, 25 Michigan, 247; *Van Fossen* v. *State*, 37 Ohio St. 317; *Whitcomb* v. *Whitcomb*, 46 Iowa, 437; *Litowitch* v. *Litowitch*, 19 Kansas, 451; *Chase* v. *Chase*, 6 Gray, 157; *Sewall* v. *Sewall*, 122 Massachusetts, 156; *Leith* v. *Leith*, 39 New Hampshire, 20; *Platt* v. *Platt*, 80 Penn. St. 501; *Hare* v. *Hare*, 10 Texas, 355; *Jackson* v. *Jackson*, 1 Johns. 424.

" Divorce is allowed only for causes approved by law. Therefore the parties cannot dissolve their own marriage, or validly agree to a suspension of the cohabitation under it. Nor, for the same reason, can the courts do either simply from their consent. So that when an attempt is made through the tribunals to accomplish this object, the public becomes in effect a party to the proceeding, not to oppose the divorce at all events, but to prevent the sentence passing except as justified by facts which the law has declared to be sufficient; ' for society has an interest in the maintenance of marriage ties, which the collusion or negligence of the parties cannot impair;' hence a divorce suit, while on its face a mere controversy between private parties of record, is, as truly viewed, a triangular proceeding *sui generis*, wherein the public, or government, occupies in effect the position of a third party." Bishop, Marriage and Divorce, 6th ed. secs. 229*b*, 230.

This view has already been sealed with the approval of this court, and the doctrine contended for was expounded at length

in *Maynard* v. *Hill*, 125 U. S. 190, 210, citing *Adams* v. *Palmer*, 51 Maine, 481, 483; *Maguire* v. *Maguire*, 7 Dana, 181, 183; *Ditson* v. *Ditson*, 4 R. I. 87, 101; *Chase* v. *Chase*, 6 Gray, 157, 161. In the first of these the supreme court of Kentucky said that marriage was more than a contract; that it was the most elementary and useful of all the social relations, was regulated and controlled by the sovereign power of the State, and could not, like mere contracts, be dissolved by the mutual consent of the contracting parties, but might be abrogated by the sovereign will whenever the public good, or justice to both parties, or either of the parties, would thereby be subserved; that being more than a contract, and depending especially upon the sovereign will, it was not embraced by the constitutional inhibition of legislative acts impairing the obligation of contracts. In the second case the supreme court of Rhode Island said that *marriage*, in the sense in which it is dealt with by a decree of divorce, is not a contract, but one of the domestic *relations*. In strictness, though formed by a contract, it signifies the *relation* of husband and wife, deriving both its rights and duties from a source higher than any contract of which the parties are capable, and as to these uncontrollable by any contract which they can make. "When formed, this relation is no more a contract than 'fatherhood' or 'sonship' is a contract."

Upon the whole case, then, it is submitted:

1st. That the writ of error should be dismissed for want of jurisdiction; or

2d. The judgment should be affirmed because it is clearly right.

Mr. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

It was suggested at bar that this court was without jurisdiction. But it is unquestionable that rights under the Constitution of the United States were expressly and in due time asserted, and that the effect of the judgment was to deny these rights. Indeed, when the argument is analyzed we think it is apparent that it but asserts that, as the court below committed

no error in deciding the Federal controversy, therefore there is no Federal question for review. But the power to decide whether the Federal issue was rightly disposed of involves the exercise of jurisdiction. *Penn Mutual Life Insurance Company* v. *Austin*, (1897) 168 U. S. 685. As the Federal question was not unsubstantial and frivolous, we pass to a consideration of the merits of the case.

The statute of the State of Massachusetts, in virtue of which the court refused to give effect to the judgment of divorce, is as follows :

" SEC. 35. A divorce decreed in another State or country according to the laws thereof by a court having jurisdiction of the cause and of both the parties, shall be valid and effectual in this Commonwealth ; but if an inhabitant of this Commonwealth goes into another State or country to obtain a divorce for a cause which occurred here, while the parties resided here, or for a cause which would not authorize a divorce by the laws of this Commonwealth, a divorce so obtained shall be of no force or effect in this Commonwealth." 2 Rev. Laws Mass. 1902, ch. 152, p. 1357 ; Pub. Stat. 1882, c. 146, § 41.

It is clear that this statute, as a general rule, directs the courts of Massachusetts to give effect to decrees of divorce rendered in another State or country by a court having jurisdiction. It is equally clear that the statute prohibits an inhabitant of Massachusetts from going into another State to obtain a divorce, for a cause which occurred in Massachusetts whilst the parties were domiciled there, or for a cause which would not have authorized a divorce by the law of Massachusetts, and that the statute forbids the courts of Massachusetts from giving effect to a judgment of divorce obtained in violation of these prohibitions. That the statute establishes a rule of public policy is undeniable. Did the court fail to give effect to Federal rights when it applied the provisions of the statute to this case, and, therefore, refused to enforce the South Dakota decree? In other words, the question for decision is, does the statute conflict with the Constitution of the United States? In coming to the solution of this question it is essential, we repeat, to bear always in mind that the prohibitions of the

statute are directed solely to citizens of Massachusetts domiciled therein, and that it only forbids the enforcement in Massachusetts of a divorce obtained in another State by a citizen of Massachusetts who, in fraud of the laws of the State of Massachusetts, whilst retaining his domicil, goes into another State for the purpose of there procuring a decree of divorce.

We shall test the constitutionality of the statute, first by a consideration of the nature of the contract of marriage and the authority which government possesses over the subject; and, secondly, by the application of the principies thus to be developed to the case in hand.

1. That marriage, viewed solely as a civil relation, possesses elements of contract is obvious. But it is also elementary that marriage, even considering it as only a civil contract, is so interwoven with the very fabric of society that it cannot be entered into except as authorized by law, and that it may not, when once entered into, be dissolved by the mere consent of the parties. It would be superfluous to cite the many authorities establishing these truisms, and we therefore are content to excerpt a statement of the doctrine on the subject contained in the opinion of this court delivered by Mr. Justice Field, in *Maynard* v. *Hill*, (1888) 125 U. S. 190 :

" Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of the people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution." (p. 205.)

*        *        *        *        *        *        *        *

" It is also to be observed that, whilst marriage is often termed by text writers and in decisions of courts-a civil contract—generally to indicate that it must be founded upon the agreement of the parties, and does not require any religious ceremony for its solemnization—it is something more than a mere contract. The consent of the parties is of course essential

to its existence, but when the contract to marry is executed by the marriage, a relation between the parties is created which they cannot change. Other contracts may be modified, restricted, or enlarged, or entirely released upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities. It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress." (p. 210.)

It follows that the statute in question was but the exercise of an essential attribute of government, to dispute the possession of which would be to deny the authority of the State of Massachusetts to legislate over a subject inherently domestic in its nature and upon which the existence of civilized society depends. True, it is asserted that the result just above indicated will not necessarily flow from the conclusion that the statute is repugnant to the Constitution of the United States. The decision that the Constitution compels the State of Massachusetts to give effect to the decree of divorce rendered in South Dakota cannot, it is insisted, in the nature of things be an abridgment of the authority of the State of Massachusetts over a subject within its legislative power, since such ruling would only direct the enforcement of a decree rendered in another State and therefore without the territory of Massachusetts. In reason it cannot, it is argued, be held to the contrary without disregarding the distinction between acts which are done within and those which are performed without the territory of a particular State. But this disregards the fact that the prohibitions of the statute, so far as necessary to be considered for the purposes of this case, are directed, not against the enforcement of divorces obtained in other States as to persons domiciled in such States, but against the execution in Massachusetts of decrees of divorce obtained in other States by persons who are domiciled in Massachusetts and who go into such other States with the purpose of practicing a fraud upon the laws of the State of their domicil; that is, to procure a divorce without obtaining a *bona fide* domicil in such other State. This being the scope of the statute, it is

evident, as we shall hereafter have occasion to show, that the argument, whilst apparently conceding the power of the State to regulate the dissolution of marriage among its own citizens, yet, in substance, necessarily denies the possession of such power by the State. But, it is further argued, as the Constitution of the United States is the paramount law, and as, by that instrument, the State of Massachusetts is compelled to give effect to the decree, it follows that the Constitution of the United States must prevail, whatever may be the result of enforcing it.

Before coming to consider the clause of the Constitution of the United States upon which the proposition is rested, let us more precisely weigh the consequences which must come from upholding the contention, not only as it may abridge the authority of the State of Massachusetts, but as it may concern the powers of government existing under the Constitution, whether state or Federal.

It cannot be doubted that if a State may not forbid the enforcement within its borders of a decree of divorce procured by its own citizens who, whilst retaining their domicil in the prohibiting State, have gone into another State to procure a divorce in fraud of the laws of the domicil, that the existence of all efficacious power on the subject of divorce will be at an end. This must follow if it be conceded that one who is domiciled in a State may whenever he chooses go into another State and, without acquiring a *bona fide* domicil therein, obtain a divorce, and then compel the State of the domicil to give full effect to the divorce thus fraudulently procured. Of course, the destruction of all substantial legislative power over the subject of the dissolution of the marriage tie which would result would be equally applicable to every State in the Union. Now, as it is certain that the Constitution of the United States confers no power whatever upon the government of the United States to regulate marriage in the States or its dissolution, the result would be that the Constitution of the United States has not only deprived the States of power on the subject, but whilst doing so has delegated no authority in the premises to the government of the United States. It would thus come to pass that the governments, state and Federal, are bereft by the

operation of the Constitution of the United States of a power which must belong to and somewhere reside in every civilized government. This would be but to declare that, in a necessary aspect, government had been destroyed by the adoption of the Constitution. And such result would be reached by holding that a power of local government vested in the States when the Constitution was adopted had been lost to the States, though not delegated to the Federal government, because each State was endowed as a consequence of the adoption of the Constitution with the means of destroying the authority with respect to the dissolution of the marriage tie as to every other State, whilst having no right to save its own power in the premises from annihilation.

But let us consider the particular clause of the Constitution of the United States which is relied upon, in order to ascertain whether such an abnormal and disastrous result can possibly arise from its correct application.

The provision of the Constitution of the United States in question is section 1 of article IV, providing that "Full faith and credit shall be given in each State to the public acts, records, and judicial proceedings of every other State." The argument is that, even although the Massachusetts statute but announces a rule of public policy, in a matter purely local, nevertheless it violates this clause of the Constitution. The decree of the court of another State, it is insisted, and not the relation of the parties to the State of Massachusetts and their subjection to its lawful authority, is what the Constitution of the United States considers in requiring the State of Massachusetts to give due faith and credit to the judicial proceedings of the courts of other States. This proposition, however, must rest on the assumption that the Constitution has destroyed those rights of local self-government which it was its purpose to preserve. It, moreover, presupposes that the determination of what powers are reserved and what delegated by the Constitution is to be ascertained by a blind adherence to mere form in disregard of the substance of things. But the settled rule is directly to the contrary. Reasoning from analogy, the unsoundness of the proposition is demonstrated. Thus, in en-

forcing the clause of the Constitution forbidding a State from impairing the obligations of a contract, it is settled by the decisions of this court, although a State, for adequate consideration, may have executed a contract sanctioning the carrying on of a lottery for a stated term, no contract protected from impairment under the Constitution results, because, disregarding the mere form and looking at substance, a State may not, by the application of the contract clause of the Constitution, be shorn of an ever inherent authority to preserve the public morals by suppressing lotteries. *Stone* v. *Mississippi*, 101 U. S. 814; *Douglas* v. *Kentucky*, 168 U. S. 488. In other words, the doctrine is, that although a particular provision of the Constitution may seemingly be applicable, its controlling effect is limited by the essential nature of the powers of government reserved to the States when the Constitution was adopted. In view of the rule thus applied to the contract clause of the Constitution, we could not maintain the claim now made as to the effect of the due faith and credit clause, without saying that the States must, in the nature of things, always possess the power to legislate for the preservation of the morals of society, but that they need not have the continued authority to save society from destruction.

Resort to reasoning by analogy, however, is not required, since the principle which has been applied to the contract clause has been likewise enforced as to the due faith and credit clause.

In *Thompson* v. *Whitman*, (1874) 18 Wall. 457, the action in the court below was trespass for the conversion of a sloop, her tackle, furniture, etc., upon a seizure for an alleged violation of a statute of the State of New Jersey. By special plea in bar the defendant set up that the seizure was made within the limits of a named county, in the State of New Jersey, and by answer to this plea the plaintiff took issue as to the place of seizure, thus challenging the jurisdiction of the justices who had tried the information and decreed the forfeiture and sale of the property. The precise point involved in the case, as presented in this court, was whether or not error had been committed by the trial court in receiving evidence to contradict the record of the New Jersey judgment as to jurisdictional facts asserted

therein, and especially as to facts stated to have been passed upon by the court which had rendered the judgment. It was contended that to permit the jurisdictional facts, which were foreclosed by the judgment, to be reëxamined would be a violation of the due faith and credit clause of the Constitution. This court, however, decided to the contrary, saying:

"We think it clear that the jurisdiction of the court by which a judgment is rendered in any State may be questioned in a collateral proceeding in another State, notwithstanding the provision of the fourth article of the Constitution and the law of 1790, and notwithstanding the averments contained in the record of the judgment itself."

The ground upon which this conclusion was predicated is thus embodied in an excerpt made from the opinion delivered by Mr. Chief Justice Marshall, speaking for the court, in *Rose* v. *Himely,* 4 Cranch, 241, 269, where it was said:

"Upon principle, it would seem, that the operation of every judgment must depend on the power of the court to render that judgment; or, in other words, on its jurisdiction over the subject matter which it has determined. In some cases, that jurisdiction, unquestionably, depends as well on the state of the thing, as on the constitution of the court. If, by any means whatever, a prize court should be induced, to condemn, as prize of war, a vessel which was never captured, it could not be contended, that this condemnation operated a change of property. Upon principle, then, it would seem, that, to a certain extent, the capacity of the court to act upon the thing condemned, arising from its being within, or without their jurisdiction, as well as the constitution of the court, may be considered by that tribunal which is to decide on the effect of the sentence."

And the same principle, in a different-aspect, was applied in *Wisconsin* v. *Pelican Insurance Co.,* (1888) 127 U. S. 265. In that case the State of Wisconsin had obtained a money judgment in its own courts against the Pelican Insurance Company, a Louisiana corporation. Availing itself of the original jurisdiction of this court, the State of Wisconsin brought in this court an action of debt upon the judgment in question. The answer of the defendant was to the effect that the judgment

was not entitled to extra-territorial enforcement, because the claim upon which it was based was a penalty imposed upon the corporation for an alleged violation of the insurance laws of the State of Wisconsin. The answer having been demurred to, it was, of course, conceded that the claim which was merged in the judgment was such a penalty. This court, having concluded that ordinarily a penalty imposed by the laws of one State could have no extra-territorial operation, came then to consider whether, under the due faith and credit clause of the Constitution of the United States, a judgment rendered upon a penal statute was entitled to recognition outside of the State in which it had been rendered, because the character of the cause of action had been merged in the judgment as such. In declining to enforce the Wisconsin judgment and in deciding that, notwithstanding the judgment and the due faith and credit clause of the Constitution, the power existed to look back of the judgment and ascertain whether the claim which had entered into it was one susceptible of being enforced in another State, the court, speaking through Mr. Justice Gray, said (p. 291):

" The application of the rule to the courts of the several States and of the United States is not affected by the provisions of the Constitution and of the act of Congress, by which the judgments of the courts of any State are to have such faith and credit given to them in every court within the United States as they have by law or usage in the State in which they were rendered. Constitution, art. 4, sec. 1; act of May 26, 1790, chap. 11, 1 Stat. 122; Rev. Stat. § 905.

" Those provisions establish a rule of evidence, rather than of jurisdiction. While they make the record of a judgment, rendered after due notice in one State, conclusive evidence in the courts of another State, or of the United States, of the matter adjudged, they do not affect the jurisdiction, either of the court in which the judgment is rendered, or of the court in which it is offered in evidence. Judgments recovered in one State of the Union, when proved in the courts of another government, whether state or national, within the United States, differ from judgments recovered in a foreign country in no

other respect than in not being reëxaminable on their merits, nor impeachable for fraud in obtaining them, if rendered by a court having jurisdiction of the cause and of the parties. *Hanley* v. *Donoghue*, 116 U. S. 1, 4.

"In the words of Mr. Justice Story, cited and approved by Mr. Justice Bradley speaking for this court, ' The Constitution did not mean to confer any new power upon the States, but simply to regulate the effect of their acknowledged jurisdiction over persons and things within their territory. It did not make the judgments of other States domestic judgments to all intents and purposes, but only gave a general validity, faith and credit to them as evidence. No execution can issue upon such judgments without a new suit in the tribunals of other States. And they enjoy not the right of priority or lien which they have in the State where they are pronounced, but that only which the *lex fori* gives to them by its own laws in their character of foreign judgments.' Story's Conflict of Laws, § 609 ; *Thompson* v. *Whitman*, 18 Wall. 457, 462, 463.

"A judgment recovered in one State, as was said by Mr. Justice Wayne, delivering an earlier judgment of this court, ' does not carry with it, into another State, the efficacy of a judgment upon property or persons, to be enforced by execution. To give it the force of a judgment in another State, it must be made a judgment there ; and can only be executed in the latter as its laws may permit.' *McElmoyle* v. *Cohen*, 13 Pet. 312, 325.

"The essential nature and real foundation of a cause of action are not changed by recovering judgment upon it ; and the technical rules, which regard the original claim as merged in the judgment, and the judgment as implying a promise by the defendant to pay it, do not preclude a court, to which a judgment is presented for affirmative action (while it cannot go behind the judgment for the purpose of examining into the validity of the claim), from ascertaining whether the claim is really one of such a nature that the court is authorized to enforce it."

2. When the principles which we have above demonstrated by reason and authority are applied to the question in hand, its solution is free from difficulty. As the State of Massachu-

setts had exclusive jurisdiction over its citizens concerning the marriage tie and its dissolution, and consequently the authority to prohibit them from perpetrating a fraud upon the law of their domicil by temporarily sojourning in another State, and there, without acquiring a *bona fide* domicil, procuring a decree of divorce, it follows that the South Dakota decree relied upon was rendered by a court without jurisdiction, and hence the due faith and credit clause of the Constitution of the United States did not require the enforcement of such decree in the State of Massachusetts against the public policy of that State as expressed in its statutes. Indeed, this application of the general principle is not open to dispute, since it has been directly sustained by decisions of this court. *Bell* v. *Bell*, 181 U. S. 175 ; *Streitwolf* v. *Streitwolf*, 181 U. S. 179. In each of these cases it was sought in one State to enforce a decree of divorce rendered in another State, and the authority of the due faith and credit clause of the Constitution was invoked for that purpose. It having been established in each case that at the time the divorce proceedings were commenced, the plaintiff in the proceedings had no *bona fide* domicil within the State where the decree of divorce was rendered, it was held, applying the principle announced in *Thompson* v. *Whitman*, 18 Wall. 457, *supra*, that the question of jurisdiction was open for consideration, and that as in any event domicil was essential to confer jurisdiction, the due faith and credit clause did not require recognition of such decree outside of the State in which it had been rendered. A like rule, by inverse reasoning, was also applied in the case of *Atherton* v. *Atherton*, 181 U. S. 155. There a decree of divorce was rendered in Kentucky in favor of a husband who had commenced proceedings in Kentucky against his wife, then a resident of the State of New York. The courts of the latter State having in substance refused to give effect to the Kentucky divorce, the question whether such refusal constituted a violation of the due faith and credit clause of the Constitution was brought to this court for decision. It having been established that Kentucky was the domicil of the husband and had ever been the matrimonial domicil, and, therefore, that the courts of Kentucky had jurisdiction over the subject matter, it

was held that the due faith and credit clause of the Constitution of the United States imposed upon the courts of New York the duty of giving effect to the decree of divorce which had been rendered in Kentucky.

But it is said that the decrees of divorce which were under consideration in *Bell* v. *Bell* and *Streitwolf* v. *Streitwolf* were rendered in *ex parte* proceedings, the defendants having been summoned by substituted service, and making no appearance ; hence, the case now under consideration is taken out of the rule announced in those cases, since here the defendant appeared and consequently became subject to the jurisdiction of the court by which the decree of divorce was rendered. But this disregards the fact that the rulings in the cases referred to were predicated upon the proposition that jurisdiction over the subject matter depended upon domicil, and without such domicil there was no authority to decree a divorce. This becomes apparent when it is considered that the cases referred to were directly rested upon the authority of *Thompson* v. *Whitman, supra,* where the jurisdiction was assailed, not because there was no power in the court to operate, by *ex parte* proceedings, on the *res,* if jurisdiction existed, but solely because the *res* was not at the time of its seizure within the territorial sway of the court, and hence was not a subject matter over which the court could exercise jurisdiction by *ex parte* or other proceedings. And this view is emphasized by a consideration of the ruling in *Wisconsin* v. *Pelican Insurance Company, supra,* where the judgment was one *inter partes,* and yet it was held that, in so far as the extra-territorial effect of the judgment was concerned, the jurisdiction over the subject matter of the State and its courts was open to inquiry, and if jurisdiction did not exist the enforcement of the judgment was not compelled by reason of the due faith and credit clause of the Constitution.

Indeed, the argument by which it is sought to take this case out of the rule laid down in the cases just referred to and which was applied to decrees of divorce in the *Bell* and *Streitwolf* cases practically invokes the overruling of those cases, and in effect, also, the overthrow of the decision in the *Atherton* case, since, in reason, it but insists that the rule announced in

those cases should not be applied merely because of a distinction without a difference.

This is demonstrated as to *Thompson* v. *Whitman* and *Wisconsin* v. *Pelican Insurance Co.*, by the considerations already adverted to. It becomes clear, also, that such is the result of the argument as to *Bell* v. *Bell* and *Streitwolf* v. *Streitwolf*, when it is considered that in both those cases it was conceded, *arguendo*, that the power to decree the divorce in *ex parte* proceedings by substituted service would have obtained if there had been *bona fide* domicil. The rulings made in the case referred to hence rested not at all upon the fact that the proceedings were *ex parte*, but on the premise that there being no domicil there could be no jurisdiction. True it is, that in *Bell* v. *Bell* and *Streitwolf* v. *Streitwolf* the question was reserved whether jurisdiction to render a divorce having extra-territorial effect could be acquired by a mere domicil in the State of the party plaintiff, where there had been no matrimonial domicil in such State—a question also reserved here. But the fact that this question was reserved does not affect the issue now involved, since those cases proceeded, as does this, upon the hypothesis conceded, *arguendo*, that if there had been domicil there would have been jurisdiction, whether the proceedings were *ex parte* or not, and therefore the ruling on both cases was that at least domicil was in any event the inherent element upon which the jurisdiction must rest, whether the proceedings were *ex parte* or *inter partes*. And these conclusions are rendered certain when the decision in *Atherton* v. *Atherton* is taken into view, for there, although the proceeding was *ex parte*, as it was found that *bona fide* domicil, both personal and matrimonial, existed in Kentucky, jurisdiction over the subject matter was held to obtain, and the duty to enforce the decree of divorce was consequently declared. Nor is there force in the suggestion that because in the case before us the wife appeared, hence the South Dakota court had jurisdiction to decree the divorce. The contention stated must rest on the premise that the authority of the court depended on the appearance of the parties and not on its jurisdiction over the subject matter—that is, *bona fide* domicil, irrespective of the

appearance of the parties. Here again the argument, if sustained, would involve the overruling of *Bell* v. *Bell* and *Streitwolf* v. *Streitwolf*. As in each of the cases jurisdiction was conferred, as far as it could be given, by the appearance of the plaintiff who brought the suit, it follows that the decision that there was no jurisdiction because of the want of *bona fide* domicil was a ruling that in its absence there could be no jurisdiction over the subject matter irrespective of the appearance of the party by whom the suit was brought. But it is obvious that the inadequacy of the appearance or consent of one person to confer jurisdiction over a subject matter not resting on consent includes necessarily the want of power of both parties to endow the court with jurisdiction over a subject matter, which appearance or consent could not give. Indeed, the argument but ignores the nature of the marriage contract and the legislative control over its dissolution which was pointed out at the outset. The principle dominating the subject is that the marriage relation is so interwoven with public policy that the consent of the parties is impotent to dissolve it contrary to the law of the domicil. The proposition relied upon, if maintained, would involve this contradiction in terms: that marriage may not be dissolved by the consent of the parties, but that they can, by their consent, accomplish the dissolution of the marriage tie by appearing in a court foreign to their domicil and wholly wanting in jurisdiction, and may subsequently compel the courts of the domicil to give effect to such judgment despite the prohibitions of the law of the domicil and the rule of public policy by which it is enforced.

Although it is not essential to the question before us, which calls upon us only to determine whether the decree of divorce rendered in South Dakota was entitled to extra-territorial effect, we observe, in passing, that the statute of South Dakota made domicil, and not mere residence, the basis of divorce proceedings in that State. As without reference to the statute of South Dakota and in any event domicil in that State was essential to give jurisdiction to the courts of such State to render a decree of divorce which would have extra-territorial effect, and as the appearance of one or both of the parties to a divorce proceed-

ing could not suffice to confer jurisdiction over the subject matter where it was wanting because of the absence of domicil within the State, we conclude that no violation of the due faith and credit clause of the Constitution of the United States arose from the action of the Supreme Judicial Court of Massachusetts in obeying the command of the state statute and refusing to give effect to the decree of divorce in question.

*Affirmed.*

MR. JUSTICE BREWER, MR. JUSTICE SHIRAS and MR. JUSTICE PECKHAM dissent.

MR. JUSTICE HOLMES, not being a member of the court when the case was argued, takes no part.